# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### Western Division

DAWN DYE, on behalf of herself and all others
similarly situated,

                    Plaintiff,

     v.

META PLATFORMS, INC.,

                    Defendant.

Case No.

Plaintiff Dawn Dye ("Plaintiff"), individually and on behalf of all other persons similarly

situated, by and through her attorneys, makes the following allegations pursuant to the

investigation of her counsel and based upon information and belief, except as to allegations

specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action suit brought against Defendant Meta Platforms, Inc.

("Meta") for surreptitiously tracking North Carolinians permanent disability placard renewals,

new car registrations, identification card renewals, and other activity on the North Carolina

Department of Motor Vehicles ("DMV") online payments portal ("myNCDMV")

https://payments.ncdot.gov website, down to the very last button click. Meta uses this

information to help it deliver targeted advertisements across its social networks, including

facebook.com and instagram.com, among others. Because neither Meta nor the DMV asked

North Carolinian drivers for their express written consent to obtain or use this highly sensitive

1

information for advertising, it violated the federal Drivers' Privacy Protection Act, 18 U.S.C. §
2721, *et seq*. ("DPPA").

2. When users visit facebook.com, Meta surreptitiously installs a tracking code,
called the Meta Tracking Pixel, onto their web browsers and many of the websites they visit.
This allows Meta to collect information about what those users do when they are off the
facebook.com website.[1]  This includes the actions Facebook users take while they are on the
myNCDMV online payments portal, at https://payments.ncdot.gov.

3. In recent years, more and more of the North Carolina DMV's work has moved
online, from voter registrations to personalized plate orders.  In the wake of the COVID-19
Pandemic, the myNCDMV online payments portal expanded to include even greater service
offerings.[2]  At the same time, however, myNCDMV hosts the Meta Tracking Pixel to allow Meta
to surveil what North Carolinians do when they are on its website to help Meta deliver targeted
advertisements to its users.

4. Regrettably, this conduct is nothing new.  The DPPA was enacted in 1994 out of
"concern related to the States' common practice of selling personal information to businesses
engaged in direct marketing and solicitation."  *Maracich v. Spears*, 570 U.S. 48, 57 (2013).
"The DPPA regulates the universe of entities that participate as suppliers to the market for motor
vehicle information—the States as initial suppliers of the information in interstate commerce and
private resellers or redisclosers of that information in commerce."  *Reno v. Condon*, 528 U.S.
141, 151 (2000).

5. The DPPA prohibits companies like Meta from "knowingly obtain[ing] … or
us[ing] personal information, from a motor vehicle record for a purpose not permitted" by the

---

[1] THE GUARDIAN, *Meta injecting code into websites to track its users, research says* (Aug. 11,
2022), https://www.theguardian.com/technology/2022/aug/11/meta-injecting-code-into-websites-
visited-by-its-users-to-track-them-research-says.

[2] WNCT 9, *NCDMV Online Services Expanding to Allow for State Issued ID Card Renewals*,
(Mar. 29, 2021), https://www.wnct.com/news/north-carolina/ncdmv-online-services-expanding-
to-allow-for-state-issued-id-card-renewals/.

law.  18 U.S.C. § 2724(a).  Obtaining and using drivers' personal information for direct marketing is not permitted by law.  *See* 18 U.S.C. § 2721(b).

**PARTIES**

6.      Plaintiff Dawn Dye is, and has been at all relevant times, a citizen of North Carolina who resides in Johnston County.  Dawn Dye has visited https://payments.ncdot.gov on multiple occasions to complete various kinds of online business with the North Carolina DMV within the last four years.

7.      Defendant Meta Platforms, Inc., is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California, 94025.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the DPPA).

9.      This Court has personal jurisdiction over Defendant because it conducts substantial business within North Carolina, including (1) the mass surveillance and collection of private information from North Carolina residents while they interact with the North Carolina DMV online payments portal, and (2) using insights derived from that mass surveillance on the North Carolina DMV online payments portal to then deliver targeted advertisements to those same North Carolina residents.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

**FACTUAL BACKGROUND**

**A.      The DPPA**

11.      The DPPA was enacted in 1994 out of a concern related to the misuse of information that had been acquired through the coercive power of the State, which was exemplified by States' common practice of selling consumer data to businesses engaged in consumer marketing and solicitation.  The DPPA regulates both state motor vehicle departments

3

as well as the people and businesses that obtain and use personal information from those departments. The DPPA provides that, unless one of its exceptions applies, a state department of motor vehicles "shall not knowingly disclose or otherwise make available" "personal information" and "highly restricted personal information" from a "motor vehicle record." 18 U.S.C. §§ 2721(a)(1)-(2). Personal information from a motor vehicle record can only be disclosed for "bulk distribution for surveys, marketing or solicitation if the State has obtained the express consent of the person to whom such personal information pertains." 18 U.S.C. § 2721(b)(12). Highly restricted personal information—such as a person's medical or disability information—can never be used for marketing. 18 U.S.C. § 2721(a)(2).

12.     The DPPA terms are broadly defined. A "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). "[P]ersonal information" means any "information that identifies an individual" and includes correlated numbers, "including … [a] social security number, driver identification number, … [or] telephone number." 18 U.S.C. § 2725(3). Additionally, the definitions of both "personal information" and "highly restricted personal information" include an individual's "medical or disability information." 18 U.S.C. § 2725(4). In order for a motor vehicle department to obtain "express consent," it must obtain "consent *in writing*, including consent conveyed electronically that bears an electronic signature." 18 U.S.C. § 2725(5).

### B.     The Meta Tracking Pixel

13.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[3] Facebook describes itself as a "real identity platform,"[4] meaning users are

[3] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

allowed only one account and must share "the name they go by in everyday life."[5]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[6]

 14. Meta owns facebook.com and generates revenue by selling advertising space on Facebook, and other applications it owns, like Instagram.[7]

 15. Meta sells advertising space by highlighting its ability to target users.[8]  Meta can target users so effectively because it surveils user activity both on and *off its site*.[9]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[10]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

 16. Advertisers can also build "Custom Audiences."[12]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[13]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build

---

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com/.

[7] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[8] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[9] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[10] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[11] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[12] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[13] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

"Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[14]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15]   One such Business Tool is the Meta Tracking Pixel.

17.     The Meta Tracking Pixel is a piece of code that advertisers can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[16]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

18.     Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[17]  Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a

---

[14] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[15] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494;
FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[16] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[17] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

visitor views or purchases.[18]  An advertiser can also create their own tracking parameters by building a "custom event."[19]

19.     Advertisers control how the Meta Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[21]  Pixel-specific Data includes "the Pixel ID and cookie."[22]

**C.     The myNCDMV online payments portal and the Meta Pixel**

20.     The myNCDMV website hosts the Meta Tracking Pixel.  The website transmits three distinct events to Meta via the Meta Tracking Pixel: "PageView," "Microdata," and "Button Click."  Figure 1 below, shows these three events being transmitted to Meta.[23]



**Figure 1**

---

[18] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[19] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[20] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[21] *Id.*

[22] *Id.*

[23] This data derives from a tool, the "Meta Pixel Helper," created and offered by Meta for download as a web browser plug-in.

7

21.    The first event, "PageView," tells Meta which specific website URL the driver has navigated to.  *See* Figure 2.  Often, this reveals what the page is about. For example, the URL in Figure 2 contains the words "disability," "handicap," and "placard", indicating that a particular person is seeking to pay for a handicap placard on the myNCDMV online payments portal. The second event, "Microdata" tells Meta the "title" of that webpage, as well as a brief "description" of what is contained on that page. *See id.*



**Figure 2**

22.    The third event, "Button Click" event tells Meta if and exactly when  a driver clicks on a particular button on a webpage, along with the text of that button.  Figure 3, below shows the "Button Click" event generated after a driver clicks on the "Continue" button shown below while on the webpage to renew a permanent disability placard.



**Figure 3**

23.    Every time a driver clicks a button on myNCDMV, a new "Button Click" event is transmitted to Meta.  So if a driver clicks on multiple buttons on a page, Meta knows every single button the driver has clicked on, as well as which corresponding button was clicked.  The myNCDMV website has many options users can click. Figure 4 shows a myNCDMV dashboard (redacted remove a person's name).  Users can click to "Renew a License or ID Card," "Request Driving Record," or "Order a Special or Personalized Plate," among other options.



**Figure 4**

9

24. This "Button Click" event is transmitted to Meta in just fractions of a second, giving Meta a real-time look into exactly what a particular driver is clicking as he or she is clicking it. As shown through a website's developer tools, which are publicly accessible by pressing the F12 button on one's keyboard, Meta gets real-time data on when a particular button is clicked on a particular webpage. For example, Figures 5-6, below, show the "Button Click" event being transmitted to Meta a driver clicked on the "Renew Permanent Disability Placard" button after being on the Dashboard page for 12.38 seconds. Meta was informed of this button click 57.57 ***thousandths*** of a second later.



**Figure 5**



**Figure 6**

25. These three custom Meta Tracking Pixel events are present on almost all https://payments.ncdot.gov webpages and convey a trove of information about a driver's personal business with the DMV. This includes whether a particular driver is seeking to renew a disability placard or a car registration, order a custom license plate, request a driver's license hearing, and various other transactions.

26. Worse yet, the Meta Tracking Pixel even transmits "highly restricted personal information," including whether a particular driver with a disability and has clicked on the "Renew Permanent Disability Placard button," arrived on the page, and continued along the process. *See* Figures 1-6, above.

27. When a driver is navigating https://payments.ncdot.gov while logged into Facebook, the myNCDMV website compels a visitor's browser to transmit an identifying "computer cookie" to Meta called "c_user," for *every* single event sent through the Meta Tracking Pixel. The c_user cookie contains that visitor's unencrypted Facebook ID. When browsing the myNCDMV page for renewing a Class C drivers license, for example, https://payments.ncdot.gov compelled the browser to send cookies to Meta. Figure 7.



**Figure 7**

28.    The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID. A Facebook ID allows *anybody*—not just Facebook—to identify the individual driver with a Facebook account. If one types www.facebook.com/[FacebookID] a into web browser, it will load that individual's Facebook page. For example, the c_user cookie in Figure 7 is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

29.    Thus, the Facebook ID number is a correlated number—just like a social security number, drivers license number, or telephone number—which can be used by anyone to identify an individual.

30.    The Meta Tracking Pixel transmits additional cookies to Meta. *See* Figure 8, next page.

**Request Cookies** ☐ show filtered out request cookies

| Name | Value |
| --- | --- |
| datr | IKMTZDnp92T5Bkqwh2LEBedt |
| sb | FXEXZF66qmf7QYrBRI0wetan |
| c_user | 1528550551 |
| m_ls | %7B%22c%22%3A%7B%221%22%3A%22HCwA... |
| usida | eyJ2ZXIiOjEsImIkIjoiQXMwNmM5aDRyMXFxayIsI... |
| xs | 24%3ATWFeKjQ4G0FB5A%3A2%3A1679257972... |
| fr | 0d6EuD9u3Wu4I9WNg.AWUsp4DQGwXozxerZ5... |

**Figure 8**

31.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[24]  Facebook, at a minimum, uses the fr cookie to identify particular users.[25]

32.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Meta uses this for targeted advertising.

33.     Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

34.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com.

35.     The usida cookie collects a combination of a webpage visitor's browser and unique identifier.  Meta uses the usida cookie to help target advertisements towards specific individuals.

---

[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

13

36.     The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, https://payments.ncdot.gov.[26]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[27]

37.     Meta introduced first-party cookies in 2018 to allow its tracking Pixel to circumvent improvements in how web browsers block third-party cookies.[28]  Third-party cookies were traditionally the primary means by which Facebook historically tracked people across the web.  Being embedded in websites as a first-party cookie, rather than as a third-party cookie, causes drivers' browsers to treat that Pixel as though it is offered by the website they are visiting, rather than by Meta, a third party.  When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Meta Pixel's collection of data.  Operating similarly to, and with the same privacy exemptions applicable to, a first party cookie became another default Pixel setting in or around October 2018.

38.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data, the myNCDMV website knowingly discloses personal information and highly restricted personal information to Meta.  By partnering with the myNCDMV website to host the Meta Tracking Pixel, Meta also knowingly obtains this same personal information and highly restricted personal information.

39.     Moreover, by collecting the c_user and fr cookies as first-party cookies, Meta is collecting a drivers' Facebook ID number from the myNCDMV website directly.

---

[26] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[27] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

[28] Sergiu Gatlan, Softpedia News, Facebook to Circumvent Cross-Site Tracking Block with New First-Party Cookie (Oct. 6, 2018), https://news.softpedia.com/news/facebook-to-circumventcross-site-tracking-block-with-new-first-party-cookie-523089.shtml.

14

40.     Meta confirms that it matches activity on the myNCDMV website with a Facebook user's profile.  Meta allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[29]  The off-site activity report confirms Meta identifies a driver's activities on the myNCDMV website.



**Figure 9**

41.     Worse yet, when Facebook users click on the arrow showing the "9 interactions" depicted in Figure 9, Meta admits it that examples of the kind of information it obtains and uses from Facebook users on the myNCDMV online payments portal include whether a user "searched for an item," "added an item to a cart" or "made a purchase."  Figure 10, *next page*.  Meta also admits that it uses this "activity to show you relevant ads and to suggest things you might be interested in."  *Id*.

---

[29] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?,
https://www.facebook.com/help/2207256669182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."



**Figure 10**

42.     Meta, after obtaining this information, uses it to deliver targeted advertisements to drivers on its various social media platforms.  This includes advertisements on Instagram for services which are ancillary to driving.  Figure 11 for example, below, shows a driver receiving a AAA ad telling them that by joining, they can "skip the trip to the DMV" on their Instagram account (owned by Meta) after visiting myNCDMV.



**Figure 11**

16

**D.     Experience of Plaintiff**

43.     Plaintiff Dye used the myNCDMV website, https://payments.ncdot.gov/ to conduct her private business with the North Carolina DMV in August 2023.

44.     Plaintiff Dye had a Facebook.com account during this time and accessed the myNCDMV website using the same browser that she used to access her Facebook account.

45.     When Plaintiff Dye was navigating the myNCDMV website, Meta obtained and used her personal information, along with various event data, including PageView, microdata and Button Click.  Alongside this event data, Defendant also obtained and used identifiers for Plaintiff Dye including the c_user and fr cookies to Meta, as first-party cookies on her web browser.

46.     Meta used this information to help it in its advertising efforts.

47.     Plaintiff Dye discovered that Defendant surreptitiously collected and used her personal information in August 2023.

## CLASS ALLEGATIONS

48.     **Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook and visited https://payments.ncdot.gov/ after September 6, 2019.

49.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

50.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

51.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case.

17

Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

      (a)    whether Defendant collected Plaintiff's and the Class's personal information;

      (b)    whether Plaintiff's and the Class's personal information was contained in a motor vehicle record;

      (c)    whether Defendant unlawfully obtained and used Plaintiff's and the Class's personal information in violation of the DPPA;

      (d)    whether Defendant's actions were committed knowingly; and

      (e)    whether Defendant disclosed Plaintiff's and the Class's personal information without consent;

52.    **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, visited the myNCDMV website, and had her personal information obtained and used by Defendant.

53.    **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex data privacy class action litigation, including litigation concerning the under other federal and state privacy statutes. Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class and Subclasses, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclasses, additional claims as may be appropriate, or to amend the definition of the Class and Subclasses to address any steps that Defendant took.

54.     **Superiority (Fed. R. Civ. P. 23(b)(3))**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

**CAUSES OF ACTION**
**COUNT I**
**Violation of the Drivers Privacy Protection Act**
**18 U.S.C. § 2721, *et seq.***

55.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

56.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

57.     The Facebook ID numbers are "personal information," within the ambit of the DPPA because they are correlated numbers that "identifies an individual," in the same way that social security numbers, driver identification number, or telephone numbers identify individuals. 18 U.S.C. § 2725(3).

58.     Webpages on the myNCDMV online payments portal are a type of "motor vehicle record" within the ambit of the DPPA, because they are records that pertain to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification cards issued by

19

the North Carolina DMV and are controlled and operated by North Carolina DMV. 18 U.S.C. § 2725(1).

59. Both encrypted and unencrypted Facebook ID numbers are found in the fr and c_users cookies, respectively. These cookies were placed on Plaintiff and Class members web browsers and eventually, on the code of the myNCDMV webpage. When Plaintiff and Class accessed a myNCDMV webpage, the c_user and fr_cookies were contained in the code of that webpage that were loaded on a person's browser. By including the c_user and fr cookies as first-party cookies, they were cookies directly stored by the myNCDMV website. As such, these Facebook ID numbers were found in a motor vehicle record—the myNCDMV website. And when these c_user and fr cookies containing individuals' Facebook ID Numbers were transmitted to Meta, Meta obtained personal information from a motor vehicle record.

60. Information about drivers applying for disability placards is "medical or disability information" which is defined as "highly restricted personal information" under the DPPA. 18 U.S.C. § 2725(4). As such, when the Meta Tracking Pixel appeared and operated on webpages on myNCDMV concerning disability placard renewals, Meta also obtained highly restricted personal information from a motor vehicle record.

61. Defendant knew it would obtain this information from the website because it allowed the North Carolina DMV to set its online payments portal as a place that hosts the Meta Tracking Pixel.

62. Defendant knowingly used the personal information it obtained from the myNCDMV website to deliver targeted advertisements to Plaintiff and Class members.

63. Neither Defendant nor the North Carolina DMV obtained express consent from Plaintiff or Class members to obtain or use their personal information for this purpose.

64. On behalf of herself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with DPPA's requirements; (iii) statutory damages of $2,500 for

20

each violation of the DPPA pursuant to 18 U.S.C. § 2724(a); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the DPPA;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 15, 2023

By:  *Blake G. Abbott*
Blake G. Abbott (N.C. Bar No.: 57190)
Paul J. Doolittle (*pro hac vice app. Forthcoming*)
**POULIN | WILLEY | ANASTOPOULO, LLC**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
E-mail: blake.abbott@poulinwilley.com

21

paul.doolittle@poulinwilley.com

**BURSOR & FISHER, P.A**.
Neal J. Deckant (*pro hac vice app. forthcoming*)
Stefan Bogdanovich (*pro hac vice app. forthcoming*)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
         sbogdanovich@bursor.com

**BURSOR & FISHER, P.A**.
Frederick J. Klorczyk III (*pro hac vice app. forthcoming*)
1330 Avenue of the Americas
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: fklorczyk@bursor.com


*Attorneys for Plaintiff*