**GIBSON, DUNN & CRUTCHER LLP**
ASHLEY E. JOHNSON
ajohnson@gibsondunn.com
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3111
Facsimile: 214.571.2949

LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendant Meta Platforms, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-00509-BO**

| | |
|---|---|
| DAWN DYE, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | **DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT** <br><br> **ORAL ARGUMENT REQUESTED** |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that Defendant Meta Platforms, Inc. hereby moves this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the complaint with prejudice.

The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; and any other matters properly before the court.

## STATEMENT OF ISSUES TO BE DECIDED

Should the complaint be dismissed under Rule 12(b)(6) for failure to state a claim?

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    A.    Meta's Pixel ........................................................................................................... 2

    B.    Meta's Disclosures ................................................................................................ 2

    C.    Meta's Restrictions on Third Parties' Use of the Pixel ......................................... 4

    D.    Plaintiff's Allegations ........................................................................................... 5

LEGAL STANDARD ............................................................................................................... 6

ARGUMENT ............................................................................................................................. 6

    I.    Plaintiff Fails to Allege Meta Received Any Identifying Information "From a Motor Vehicle Record." ....................................................................................... 7

    II.    Plaintiff Fails to Allege Meta Obtained Any Data for an Improper Purpose. ........... 10

    III.    Plaintiff Fails to Allege Meta "Knowingly" Obtained or Used Protected Information for an Improper Purpose. .................................................................. 12

CONCLUSION ....................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. Sirius XM Radio Inc.*,
    932 F.3d 1253 (9th Cir. 2019) ................................................................................ 8, 9, 10, 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................... 6, 10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................................... 6

*Downing v. Globe Direct LLC*,
    682 F.3d 18 (1st Cir. 2012) ............................................................................................ 10

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009) ................................................................................................ 12, 14

*Garey v. James S. Farrin, P.C.*,
    35 F.4th 917 (4th Cir. 2022) ......................................................................................... 6, 9

*Gershzon v. Meta Platforms, Inc.*,
    2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) ...................................... 1, 7, 9, 10, 12, 14

*Lake v. Neal*,
    585 F.3d 1059 (7th Cir. 2009) ......................................................................................... 8

*Lloyd v. Facebook, Inc.*,
    2022 WL 4913347 (N.D. Cal. Oct. 3, 2022) ............................................................. 2, 11

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    745 F.3d 131 (4th Cir. 2014) ........................................................................................... 2

*Philips v. Pitt Cnty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009) ........................................................................................ 2, 5

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019) .............................................................................................. 12, 14

*Ruan v. United States*,
    142 S. Ct. 2370 (2022) .............................................................................................. 12, 14

*Sons of Confederate Veterans, Va. Div. v. City of Lexington*,
    722 F.3d 224 (4th Cir. 2013) ........................................................................................... 6

**Statutes**

18 U.S.C. § 1028A(a)(1) ....................................................................................................... 14

18 U.S.C. § 2721(b)(1) ............................................................................................... 10, 11, 12

18 U.S.C. § 2721(b)(1)–(14) ........................................................................................... 10, 13

18 U.S.C. § 2721(b)(2) ............................................................................................... 10, 11, 12

18 U.S.C. § 2721(b)(13) ................................................................................................. 10, 11, 12

18 U.S.C. § 2724(a) ............................................................................................................ 6, 7, 10, 12

18 U.S.C. § 2725(1) .................................................................................................................... 8

18 U.S.C. § 2725(3) .................................................................................................................... 7

18 U.S.C. § 2725(5) .................................................................................................................. 11

**Other Authorities**

Merriam-Webster's Collegiate Dictionary (11th ed. 2004) ................................................................ 8

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff Dawn Dye alleges that Meta violated the Driver's Privacy Protection Act (DPPA) when the North Carolina Department of Motor Vehicles (DMV) used Meta's version of a common Internet tool, the Meta Pixel, to measure users' activity on the DMV website. Website developers like the DMV can install this commonly used tool—which is similar to those offered by a variety of other companies—on their websites and customize it to measure particular types of user activity, such as the webpages users view or the buttons they click. Developers decide whether to use the Pixel and what information to share with Meta, and they specifically commit to Meta that (1) they will share data with Meta only if they have the proper permissions and legal rights to do so, and (2) they will not send any sensitive data to Meta.

Plaintiff's complaint does not state a claim under the DPPA. That statute does not prohibit state DMVs from sharing any and all information with third parties or from using commonplace Internet tools to measure activity on their websites. Instead, it protects a specific kind of information under specific circumstances: *personal information* (a defined term) that comes *from a motor vehicle record* (another defined term), if that information is being put to a *use* not authorized by the statute. And it imposes liability on private parties only if they transgress these limitations *knowingly*.

Plaintiff's allegations do not fit the bill. Plaintiff never alleges which specific webpages she visited or which buttons she clicked on the DMV's website—which makes this case different from an ongoing suit in the Northern District of California over the California DMV's use of the Pixel. *See Gershzon v. Meta Platforms, Inc.*, 2023 WL 5420234 (N.D. Cal. Aug. 22, 2023). Instead, the "personal information" plaintiff says Meta received about her consists of computer cookies containing her Facebook ID number. Cookies are small pieces of text commonly used to store information on web browsers; they are ubiquitous throughout the web and can serve a number of different functions, such as improving security, identifying web browsers, and storing ad preferences. As plaintiff recognizes, cookies come from a user's web browser—not from any "record" at all, much less a driver's "motor vehicle record." That alone is dispositive. And her claim fails for other reasons, too: plaintiff fails to allege her information was used for an impermissible purpose (especially in light of her consent to

Meta's clear disclosures when she signed up for a Facebook account), or that Meta knowingly received any protected information for such a purpose. Each of these failures is independently fatal to plaintiff's claim, and this Court should dismiss with prejudice.

## BACKGROUND

### A. Meta's Pixel

This case is about the North Carolina DMV's use of the Meta Pixel, Meta's version of a common Internet tool that Meta makes available to third-party web developers. The Meta Pixel is "a piece of code" that third-party web developers can "integrate into their website." Compl. ¶ 17. Developers, including the North Carolina DMV, can use the Pixel to (1) measure certain actions users take on the developers' own sites, such as the webpages users view and the buttons they click, and (2) send that information to Meta to help assess and improve the effectiveness of the developers' advertising. *Id.* ¶¶ 17–18. The Pixel is customizable, and developers "control what actions" it will measure. *Id.* ¶ 18. Developers also "control how the [Pixel] identifies visitors," which can be done through cookies. *Id.* ¶ 19; *see infra* 4. It is up to each third-party developer to decide whether, how, where, and when to use the Pixel tool. Compl. ¶¶ 17–19. As discussed below, however, Meta contractually prohibits developers from sharing sensitive data through the Pixel, including any information defined as sensitive under applicable laws. Meta's Request for Judicial Notice ("RJN") Ex. 4 §§ 1(e), 1(h), 3(c); *see infra* 4–5.

### B. Meta's Disclosures

When users sign up for a Facebook account, they agree to Meta's Terms of Service (the "Terms"), which govern the relationship between Meta and its users, along with Meta's Privacy Policy and Cookies Policy. RJN Exs. 1, 2, 3; *see, e.g.*, *Lloyd v. Facebook, Inc.*, 2022 WL 4913347, at *1, *4 (N.D. Cal. Oct. 3, 2022). The Terms and both policies are publicly available and properly subject to judicial notice, and the Cookies Policy is also incorporated by reference into plaintiff's complaint. Compl. ¶ 31 & n.25; *see U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). These documents explain to users how the Pixel works and what it is used for.

Gibson, Dunn & Crutcher LLP

***Terms of Service.*** The Terms of Service govern the "use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software" Meta offers. RJN Ex. 1. Meta believes its "services are most useful when people are connected to people, groups, and organizations they care about," and Meta informs users that it "use[s] data about the connections you make, the choices and settings you select, and what you share and do on and off our Products" to "personalize your experience." *Id.* The Terms explain that Meta shows users "personalized ads, offers, and other sponsored or commercial content to help [them] discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Meta Products." *Id.* To provide these services, the Terms explain, Meta "collect[s] and use[s] your personal data." *Id.* The Terms link to the Privacy Policy for more information.

***Privacy Policy.*** The Privacy Policy "describes the information [Meta] process[es] to provide Meta Products," including Facebook and the Meta Business Tools (which include the Pixel). RJN Ex. 2. Among other things, the Privacy Policy tells users that Meta "receive[s] information using cookies and similar technologies, like the Meta Pixel or Social Plugins, when you visit other websites and apps that use our Business Tools or other Meta Products." *Id.* Third-party web developers, the policy explains, can send Meta "a variety of your information and activities on and off our Products," including "[y]our device information," "[h]ow you use [third-party websites'] products and services," and "[w]ebsites you visit and cookie data, like through . . . the Meta Pixel." *Id.* Developers can "share information like your email address, cookies, and advertising device ID." *Id.* The Privacy Policy also links to the Cookies Policy for additional information. *Id.*

The Privacy Policy discloses that Meta then uses this information "to personaliz[e] features, content and recommendations, such as your Facebook Feed, Instagram feed, Stories, and ads." *Id.*; *see also id.* (Meta "use[s] this information to . . . [p]rovide insights and measurement reports to businesses, advertisers and other partners to help them measure the effectiveness and distribution of their or their clients' ads, content and services," and to "[p]rovide aggregated user analytics and insights reports that help businesses, advertisers and other partners better understand the audiences with whom they may want to connect"). These functions help third-party developers measure "how people interact with

their websites." *Id.* Meta also gives users the option of turning off "ads based on [their] activity on other websites." *Id.*

*Cookies Policy.* Cookies are "small pieces of text used to store information on web browsers." RJN Ex. 3. They "store and receive identifiers and other information on computers, phones and other devices," and they can serve a number of different functions—for example, "personalising content, tailoring and measuring ads, and providing a safer experience." *Id.* Meta's Cookies Policy tells users that Meta "use[s] cookies if you have a Facebook or Instagram account, use the Meta Products, including our website and apps, or visit other websites and apps that use the Meta Products." *Id.* The policy explains that cookies allow Meta to "understand the information that we receive about you, including information about your use of other websites," and that Meta "use[s] cookies to help us show ads and to make recommendations for businesses and other organisations to people who may be interested in the products, services, or causes they promote." *Id.* Cookies allow Meta "to provide insights about the people who use the Meta Products, as well as the people who interact with the ads, websites and apps of our advertisers and the businesses that use the Meta Products." *Id.*; *see also id.* (Meta "uses cookies and receives information when you visit [websites that use the Meta Products], including device information and information about your activity").

The Cookies Policy describes the cookie used to enable the Meta Pixel ("_fbp") and explains that Meta's "business partners may also choose to share information with Meta from cookies set in their own websites' domains." *Id.* It also describes two commonly used cookies, the "c_user" and "fr" cookies. *Id.* The c_user cookie is used to authenticate users and keep them logged in as they navigate between Facebook pages, and to remember a browser, so that users "don't have to keep logging in to Facebook and . . . can more easily log in to Facebook via third-party apps and websites." *Id.* It "contains [a user's] unencrypted Facebook ID," a number associated with a person's Facebook account. Compl. ¶¶ 27–29. The fr cookie is "used to deliver, measure and improve the relevancy of ads," so that (for example) users "don't see the same ad over and over again." RJN Ex. 3. This cookie contains "an encrypted Facebook ID and browser identifier." Compl. ¶ 31.

C. **Meta's Restrictions on Third Parties' Use of the Pixel**

Third-party web developers that use Meta's services—including the Pixel—must agree to

Meta's publicly available Business Tools Terms, which are subject to judicial notice. *See Philips*, 572 F.3d at 180. The Business Tools Terms require developers to "represent and warrant that you (and any data provider that you may use) have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." RJN Ex. 4 § 1(e). Developers must also "represent and warrant that [they] have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage," including a "clear and prominent notice on each web page where [Meta] pixels are used that links to a clear explanation [of] . . . how users can opt-out of the collection and use of information for ad targeting." *Id.* §§ 3(c), 3(c)(i). As a condition of using the Pixel tool, developers specifically agree that they will "not share Business Tool Data . . . that [they] know or reasonably should know . . . includes health, financial information or other categories of sensitive information (*including any information defined as sensitive under applicable laws*, regulations and applicable industry guidelines)." *Id.* § 1(h) (emphasis added).

### D. Plaintiff's Allegations

Plaintiff is a North Carolina citizen. Compl. ¶ 6. She alleges that she had a Facebook account "in August 2023," and that she visited the myNCDMV website during this time "to conduct her private business." *Id.* ¶¶ 6, 43–44. She claims that the DMV has configured the Meta Pixel on its website. *Id.* ¶ 20.

Plaintiff alleges the DMV "transmits three distinct events to Meta" through the Pixel: "'PageView,' 'Microdata,' and 'Button Click.'" Compl. ¶ 20. The first event (PageView) "tells Meta which specific website URL the driver has navigated to." *Id.* ¶ 21. The second event (Microdata) "tells Meta the 'title' of that webpage, as well as a brief 'description' of what is contained on that page." *Id.* The third event (Button Click) tells Meta "when a driver clicks on a particular button on a webpage, along with the text of that button." *Id.* ¶ 22.

Plaintiff never alleges that she visited any particular webpage within the myNCDMV website or clicked any particular button (and despite generalized allegations about how the Pixel could collect information about a person's application for a disabled parking placard, plaintiff never alleges she is disabled or applied for such a placard). Instead, she simply notes generally that she visited the DMV's

website "to complete various kinds of online business with the North Carolina DMV" and "to conduct her private business with the North Carolina DMV." Compl. ¶¶ 6, 43. Plaintiff alleges that "[w]hen [she] was navigating the myNCDMV website, Meta obtained and used her personal information, along with various event data, including PageView, microdata and Button Click." *Id.* ¶ 45. The "personal information" plaintiff alleges Meta obtained consists of "identifiers for [plaintiff] including the c_user and fr cookies . . . on her web browser." *Id.*; *see also id.* ¶¶ 57, 59 ("The Facebook ID numbers [contained in the c_user and fr cookies] are 'personal information.'").

Plaintiff brings a claim under the DPPA seeking monetary and injunctive relief on behalf of herself and a putative class of "all persons in the United States who have Facebook and visited https://payments.ncdot.gov/ after September 6, 2019." Compl. ¶ 48.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss, the court must first separate the complaint's legal conclusions—which are disregarded—from its factual allegations. *Id.* at 678–79. The remaining factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If the complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Claims also may be dismissed based on a dispositive issue of law. *Sons of Confederate Veterans, Va. Div. v. City of Lexington*, 722 F.3d 224, 228 (4th Cir. 2013).

## ARGUMENT

To state a claim, plaintiff must plausibly allege that Meta (1) obtained or used "personal information," as defined by the statute; (2) "from a motor vehicle record," as defined by the statute; (3) for an improper purpose not permitted by the statute; and (4) did so "knowingly." 18 U.S.C. § 2724(a); *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 920 (4th Cir. 2022). The complaint does not allege facts that could satisfy these elements.

As noted above, plaintiff never alleges that she visited any particular webpage or clicked on any particular button on the DMV's website, or that Meta received any information from her driving

Gibson, Dunn & Crutcher LLP

records or the like. The only "personal information" plaintiff alleges the DMV sent to Meta about her is computer cookies, which (as plaintiff alleges) are stored in users' browsers and do not come "from a motor vehicle record." And even if the information at issue here were regulated by the DPPA, Meta's use of that information would still be permissible: the DPPA allows personal information to be used "in carrying out [the DMV's] functions" and for "motor vehicle market research activities," and plaintiff also consented when she signed up for a Facebook account and agreed to Meta's policies, which clearly and explicitly disclose that Meta receives cookies when users browse third-party websites that use Meta's Business Tools. Finally, and in any event, Meta did not "knowingly" receive any protected information for an impermissible purpose. The court should dismiss the complaint with prejudice.

I. **Plaintiff Fails to Allege Meta Received Any Identifying Information "From a Motor Vehicle Record."**

The DPPA defines "personal information" as "information that identifies an individual." 18 U.S.C. § 2725(3). Here, the only "personal information" plaintiff alleges Meta received about her is her "c_user and fr cookies," which plaintiff says reveal her "Facebook ID number" (*i.e.*, a number associated with a person's Facebook profile page). Compl. ¶¶ 28–29, 45, 57. While plaintiff also generally alleges that the Pixel sends Meta other information about which webpages a user visits and which buttons they click, *see id.* ¶¶ 20–26, she does not allege that information is "personal information" or point to any specific webpages *she* visited or buttons *she* clicked. This case is therefore unlike *Gershzon v. Meta Platforms, Inc.*—an ongoing case before Judge Illston in the Northern District of California—where the plaintiff alleged that he visited the California DMV's website "to apply for a disabled parking placard" and that he clicked on specific buttons and links that revealed to Meta "his first name, e-mail address, and disability information." 2023 WL 5420234, at *3 (N.D. Cal. Aug. 22, 2023). Here, unlike in *Gershzon*, the only alleged "personal information" at issue consists of two computer cookies.

The problem for plaintiff is that the DPPA does not forbid disclosure of *all* personal information; rather, it is limited to personal information that comes "from a motor vehicle record." 18 U.S.C. § 2724(a). A motor vehicle record is "any record that pertains to a motor vehicle operator's

Gibson, Dunn & Crutcher LLP

7

DEFENDANT'S MOTION TO DISMISS
CASE NO. 5:23-CV-00509-BO

permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." *Id.* § 2725(1). For several independent reasons, the data plaintiff alleges the DMV sent to Meta about her—her "c_user and fr cookies," Compl. ¶ 45—did not come "from" any "motor vehicle" "record."

*First*, plaintiff does not identify any "record" at all. She asserts the "[w]ebpages on the myNCDMV online payments portal are a type of 'motor vehicle record' within the ambit of the DPPA," Compl. ¶ 58, but that makes little sense. *See also id.* ¶ 59 (alleging "the myNCDMV website" is a "motor vehicle record"). As the Ninth Circuit has explained, "Congress intended the DPPA to reflect the Privacy Act of 1974, which defines a 'record' as '*information about an individual* that is maintained by an agency.'" *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1260 (9th Cir. 2019) (citation omitted; emphasis altered). That includes, for example, DMV files reflecting the information a person submits when she applies for a driver's license or identification card. *See* 18 U.S.C. § 2725(1). A public-facing webpage, by contrast, does not contain any "information about an individual." *Andrews*, 932 F.3d at 1260 (quotation marks omitted). If a law-enforcement agency asked the DMV to pull every record it had about plaintiff, it would likely be surprised if the DMV returned printouts of pages from its public website.

*Second*, even if DMV webpages could qualify as records, they would not qualify as "motor vehicle" records. 18 U.S.C. § 2725(1). Again, a "motor vehicle record" is a record that "pertains to" a motor vehicle operator's permit, title, registration, or identification card. *Id.* To "pertain" to something means "to belong as a part, member, accessory, or product." *Lake v. Neal*, 585 F.3d 1059, 1061 (7th Cir. 2009) (quoting Merriam-Webster's Collegiate Dictionary (11th ed. 2004)). A public-facing webpage does not "belong as a part, member, accessory, or product," *id.*, to any operator's permit, vehicle title, registration, or identification card issued by the DMV, 18 U.S.C. § 2725(1)—rather, it exists prior to and independently of the DMV's issuance of any permit, title, registration, or identification card. Again, no one would expect to find printouts of the DMV's webpages among the files the DMV keeps on plaintiff's operator's permit, vehicle title, registration, or identification card.

*Third*, even assuming DMV webpages were motor vehicle records, plaintiff's own allegations show her identifying information—the c_user and fr cookies—did not come "from" the DMV's

webpages. Plaintiff alleges they came from "her web browser." Compl. ¶ 45; *see also id.* ¶¶ 27, 38. That fact is dispositive. Cookies are basic and ubiquitous computer identifiers that are created, and subsequently exist, independently of any "motor vehicle record," and they are used across the web. *See supra* 4. Plaintiff alleges the "c_user and fr cookies" were "*stored by* the myNCDMV website," Compl. ¶ 59 (emphasis added), but that is not enough: when "the initial source of personal information is a record in the possession of an individual, rather than a state DMV, then use or disclosure of that information does not violate the DPPA." *Andrews*, 932 F.3d at 1260; *see also Garey*, 35 F.4th at 925 (rejecting claim where defendant did not "obtain[] any of the Plaintiffs' personal information '*from*' any of the sources that they argue constitute 'motor vehicle record[s]'").

Judge Illston's recent decision in *Gershzon* does not compel a different result—both because it is distinguishable and, respectfully, because it is wrong. There, the alleged "personal information" at issue was the plaintiff's "first name, e-mail address, and information that [he] began an application for a disabled parking placard and later checked the status of that application." 2023 WL 5420234, at *5. The plaintiff in *Gershzon* alleged that this information "derive[d] from the DMV database" and that "the DMV maintained [his] personal information after [he] provided it to the DMV through his 'MyDMV' online account." *Id.* at *7–8. Judge Illston concluded these allegations raised "factual questions that are not amenable to resolution at the pleadings stage." *Id.* at *8. The *Gershzon* court further found that "a disability parking placard (and an application for such a placard) does pertain to a motor vehicle operator's permit." *Id.* The same cannot be said for cookies, which Judge Illston mentioned only in passing. Plaintiff's own complaint acknowledges that cookies come from her web browser, Compl. ¶¶ 27, 38, 45, and there is no serious argument that cookies have *anything* to do with— much less "pertain to"—plaintiff's operator's permit, title, registration, or identification card records. Nor does plaintiff allege that she ever provided her cookie information to the DMV as part of creating her account or that the DMV subsequently "maintained" that information before providing it to Meta. To the extent *Gershzon* could be read more broadly to encompass cookies, it is simply wrong: the

DPPA is crystal clear that information coming "from" any source other than a "motor vehicle record" is not covered.[1]

Because plaintiff's c_user and fr cookies—the only personal information she alleges the DMV sent to Meta—were not pulled "from" any "motor vehicle" "record," her claim should be dismissed.

## II. Plaintiff Fails to Allege Meta Obtained Any Data for an Improper Purpose.

Plaintiff's DPPA claim fails for an additional reason: she has not alleged Meta obtained or used her personal information "for a purpose not permitted" under the statute. 18 U.S.C. § 2724(a). The DPPA sets forth fourteen permissible purposes, each of which "is like a key to unlock a door through which a person may go to escape DPPA liability." *Downing v. Globe Direct LLC*, 682 F.3d 18, 23 (1st Cir. 2012); *see* 18 U.S.C. § 2721(b)(1)–(14). Three purposes are relevant here: assisting the DMV "in carrying out its functions," 18 U.S.C. § 2721(b)(1); conducting "motor vehicle market research activities," *id.* § 2721(b)(2); and any use pursuant to "the written consent of the individual to whom the information pertains," *id.* § 2721(b)(13). Plaintiff alleges that Meta used personal information "to deliver targeted advertisements" and asserts she did not provide "express consent" for this, Compl. ¶¶ 62–63, but as explained below, the first allegation is entirely consistent with two permissible purposes (subsections (b)(1) and (b)(2)), and the second simply asserts an incorrect legal conclusion. *See Iqbal*, 556 U.S. at 678 (not enough to allege "facts that are 'merely consistent with' a defendant's liability," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (quotation marks omitted).

*Subsections 2721(b)(1)–(2).* The DPPA allows "any government agency," like the DMV, to use drivers' personal information "in carrying out its functions." 18 U.S.C. § 2721(b)(1). It also allows

---

[1] In addition to the c_user and fr cookies at issue, plaintiff alleges Meta also receives data showing the webpages a user browses and the buttons they click. *See* Compl. ¶¶ 20–26. As noted above, this Court need not address that information, because plaintiff does not allege any of it constitutes "personal information" (nor does she allege which webpages she viewed or which buttons she clicked, or that she applied for a disabled parking placard)—which further distinguishes this case from *Gershzon*. But notably, and contrary to *Gershzon*'s suggestion that this issue "raise[s] factual questions," browsing and button-click information could not suffice regardless because it is generated in real time (in the form of HTTP requests) as a person navigates the DMV's website, not pulled "from" any "motor vehicle record." *See* Compl. ¶ 19; *see also Andrews*, 932 F.3d at 1260 (a record that is not "maintained by" the DMV is "outside the bounds of the DPPA"); *contra Gershzon*, 2023 WL 5420234, at *8.

10
DEFENDANT'S MOTION TO DISMISS
CASE NO. 5:23-CV-00509-BO
Case 5:23-cv-00509-BO-BM   Document 15   Filed 12/01/23   Page 15 of 20

"any private person or entity acting on behalf of" such an agency to do the same. *Id.* The Pixel helps the North Carolina DMV, like countless other web developers, carry out its functions by measuring user activity on its website and improving the quality of the online services it offers. *See supra* 2. Similarly, the DPPA allows the use of personal information "in connection with . . . motor vehicle market research activities." 18 U.S.C. § 2721(b)(2). The DMV's use of the Pixel supports its own market research activities regarding how users browse its website. *See* Compl. ¶¶ 16–19 (alleging the Pixel is used to "track[] the people and type of actions they take" online, "analyze[]" these actions, and "assimilate[] [them] into datasets"). Again, this is a core function of Meta's Pixel. *See supra* 2.

   *Subsection 2721(b)(13).* The DPPA also allows "use by any requester" of information pursuant to "written consent of the individual to whom the information pertains." 18 U.S.C. § 2721(b)(13).[2] Plaintiff alleges she is a Facebook user, Compl. ¶ 44, and is thus subject to Meta's Terms of Service, "to which all users must agree to create a Facebook account." *Lloyd*, 2022 WL 4913347, at *1. The Terms of Service disclose that Meta "collect[s] and use[s] your personal data," and point users to the Privacy Policy to "learn about how." RJN Ex. 1. And the Privacy Policy explicitly states that Meta "receive[s] information using cookies and similar technologies, like the Meta Pixel or Social Plugins, when you visit other websites and apps that use our Business Tools [including the Meta Pixel] or other Meta Products." RJN Ex. 2; *see also id.* ("We use cookies and similar technologies, including data that we store on your web browser or device, identifiers associated with your device and other software, Social Plugins and the Meta Pixel."). It further discloses that Meta uses this information to "personaliz[e] content" and "tailor[] and measur[e] ads." *Id.* And it links to the Cookies Policy, which provides further details and expressly describes the "c_user" and "fr" cookies plaintiff alleges Meta received in this case. RJN Ex. 3. It is hard to imagine any clearer disclosure: Meta tells users it receives information about them when they browse third-party websites, tells users that information may be used to deliver targeted ads, and explicitly describes the exact cookies at issue in this case.

   In *Gershzon*, Judge Illston concluded that "[w]hether Meta in fact had a permissible purpose in obtaining and using personal information from the DMV website raises factual questions to be resolved on summary judgment or at trial," and declined to "draw inferences" from Meta's Privacy Policy or

---

[2] Written consent includes "consent conveyed electronically." 18 U.S.C. § 2725(5).

Cookies Policy in Meta's favor. 2023 WL 5420234, at *9 & n.3 (concluding "Meta may renew its arguments about consent and permissible purposes on a fuller factual record"). Meta respectfully disagrees with that conclusion: there are no factual issues that prevent the court from concluding that the DMV, like other web developers, used the Pixel to help "carry[] out its functions," 18 U.S.C. § 2721(b)(1), or conduct "market research activities," *id.* § 2721(b)(2). Moreover, because this case (unlike *Gershzon*) involves only cookies, plaintiff's consent is even clearer because the Cookies Policy describes the *exact* cookies at issue here (c_user and fr) and discloses that Meta receives and uses them when users visit third-party websites. *Id.* § 2721(b)(13); *see supra* 4. As a result, there are no factual questions preventing dismissal here.

### III. Plaintiff Fails to Allege Meta "Knowingly" Obtained or Used Protected Information for an Improper Purpose.

The DPPA imposes liability only if a defendant violates it "knowingly." 18 U.S.C. § 2724(a). Under basic principles of statutory interpretation, this scienter requirement applies to each element of the offense. *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) (courts "normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime") (some quotation marks omitted); *see also, e.g.*, *Ruan v. United States*, 142 S. Ct. 2370, 2376 (2022); *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). Plaintiff's allegations do not satisfy that requirement, because her complaint fails to plausibly allege Meta knew the DMV was sending it protected information—that is, (1) "personal information," (2) "from a motor vehicle record," (3) being used "for a purpose not permitted" by the DPPA. 18 U.S.C. § 2724(a).

As plaintiff alleges, Meta's Pixel is designed to measure real-time user interactions on third-party websites, like which webpages a person views or which buttons they click. Compl. ¶¶ 20–26. It is *not* designed to pull any information at all "from a motor vehicle record"—much less any "personal information"—and plaintiff does not plausibly allege otherwise. Instead, plaintiff offers conclusory assertions—for example, that Meta "knew it would obtain this information from the website because it allowed the North Carolina DMV to set its online payments portal as a place that hosts the Meta Tracking Pixel." *Id.* ¶ 61. But all that shows is that Meta knew the North Carolina DMV, like countless other websites, used a commonplace Internet tool; it does not show Meta knew the DMV would use

that tool to send protected information (even assuming that happened here; for the reasons above, plaintiff does not allege that it did). Plaintiff's theory proves far too much: if merely allowing a DMV to use the Pixel means Meta *knows* the DMV will send "personal information" "from a motor vehicle record" in violation of the DPPA, the implication is that DMVs cannot lawfully use the Pixel tool *at all*. That would vastly expand the specific restrictions Congress placed over a specific body of defined information—"personal information," "from a motor vehicle record"—and transform the DPPA into a much more onerous imposition on state DMVs than Congress intended or the text allows. *Cf. Andrews*, 932 F.3d at 1261 (rejecting "expansive conception of the DPPA [that] does not align with the statute's clear purpose").

Even putting those problems aside and assuming Meta knew the DMV was sending protected information, plaintiff never alleges Meta knew the DMV was doing so for an impermissible purpose. As plaintiff alleges, third-party web developers like the DMV—not Meta—decide when, whether, where, and how to use the Pixel, including what information they want to gather. *See supra* 2. And, as noted above, there are *fourteen* permissible purposes for obtaining or using personal information under the DPPA, including for use "in carrying out [the DMV's] functions," conducting "motor vehicle market research activities," pursuant to consent, and a long list of others. *See* 18 U.S.C. § 2721(b)(1)–(14). Plaintiff never alleges Meta knew the DMV's use of the Pixel ran outside this list of permissible uses.

In fact, the only affirmative actions Meta arguably takes are designed to *avoid* receipt of protected information. Meta requires all third-party developers who use the Pixel to "have the right to collect, use and share [users'] information before giving it to [Meta]." RJN Ex. 2; *see also* RJN Ex. 4 §§ 1(e), 3(c) (third-party developers must "represent and warrant that [they] provided robust and sufficiently prominent notice to users regarding" data "collection, sharing and usage," and that they have "all of the necessary rights and permissions and a lawful basis . . . for the disclosure" of data). Where, as here, a defendant's actions are reasonably aimed at *preventing* the improper receipt, use, or disclosure of personal information, there is no "knowing" DPPA violation.

Judge Illston did not engage with these issues in *Gershzon* because she concluded that "the 'knowingly' requirement" is limited "to the first element of a DPPA claim—'obtains, discloses or uses

13

Case 5:23-cv-00509-BO-BM   Document 15   Filed 12/01/23   Page 18 of 20
DEFENDANT'S MOTION TO DISMISS
CASE NO. 5:23-CV-00509-BO

personal information.'" 2023 WL 5420234, at *10. Judge Illston therefore held the *Gershzon* plaintiff sufficiently alleged "that Meta 'knowingly obtains, discloses or uses personal information' under the DPPA" because he alleged Meta knew the DMV used the Pixel to send it data, *id.*, but she did not require the plaintiff to allege Meta knew this information was *personal information*, *from a motor vehicle record*, being *used for an impermissible purpose*. That is wrong: Judge Illston did not grapple with recent Supreme Court precedent emphasizing that courts "normally read the statutory term 'knowingly' as applying to *all* the subsequently listed elements of the crime." *Rehaif*, 139 S. Ct. at 2196 (emphasis added; some quotation marks omitted). Indeed, in analyzing a statute with language similar to the language in the DPPA—punishing any person who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person," 18 U.S.C. § 1028A(a)(1)—the Supreme Court *expressly rejected* an attempt to cabin "knowingly" to the first element alone:

> As a matter of ordinary English grammar, it seems natural to read the statute's word "knowingly" as applying to all the subsequently listed elements of the crime. The Government cannot easily claim that the word "knowingly" applies only to the statute's first four words, or even its first seven. It makes little sense to read the provision's language as heavily penalizing a person who "transfers, possesses, or uses, without lawful authority" a *something*, but does not know, at the very least, that the "something" (perhaps inside a box) is a "means of identification."

*Flores-Figueroa*, 556 U.S. at 650. So too here: it "makes little sense" to read the DPPA to penalize Meta for obtaining "a *something*" if Meta "does not know, at the very least, that the 'something'" is information the DPPA actually protects—*i.e.*, personal information, from a motor vehicle record, used for an improper purpose. *Id.*; *see also, e.g.*, *Ruan*, 142 S. Ct. at 2376 ("knowingly" applies to "except as authorized" clause in statute governing controlled substances). Plaintiff's allegations do not meet these statutory requirements.

## CONCLUSION

This Court should dismiss the complaint with prejudice for failure to state a claim.

| | | |
|---|---|---|
| 1 | This 1st day of December 2023. | **GIBSON, DUNN & CRUTCHER LLP** |
| 2 | | |
| 3 | | By: */s/ Ashley E. Johnson* |
| | | ASHLEY E. JOHNSON (NC Bar No. 36213) |
| 4 | | ajohnson@gibsondunn.com |
| | | 2001 Ross Avenue, Suite 2100 |
| 5 | | Dallas, TX 75201 |
| | | Telephone: 214.698.3111 |
| 6 | | Facsimile: 214.571.2949 |
| | | Local Civil Rule 83.1(d) Attorney for Defendant |

*/s/ Lauren R. Goldman*
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendant Meta Platforms, Inc.*